FULTON & BRO. *et al.* *v.* GIBIAN & CO. *et al.*

1. Where an insolvent partnership executed and delivered to several of its creditors mortgages upon its assets, and also executed and delivered to these and other creditors, as collateral security for their claims, an assignment of the choses in action belonging to the partnership, these mortgages and the latter instrument, whether taken singly or collectively, did not constitute such an assignment as rendered the assignment acts of 1881

and 1885 applicable, there being nothing in any of these instruments creating a trust in favor of the debtors or any one else, and the only persons deriving any benefit therefrom being those to whom the instruments were given.

2. It makes no difference that the assignment of the choses in action provided that certain of the creditors therein named should be first paid out of the proceeds realized from the collection of the papers assigned, and that the balance of such proceeds should then be applied *pro rata* to the claims of the other creditors mentioned in the instrument, the assignment being directly to all these creditors of both classes, and not charging any of them with any duty of collecting for the others, or imposing upon any of the assignees a trust of any kind.

3. The evidence relied upon by one of the intervening partnerships to establish its contention that it was entitled to rescind the sale of its goods to the failing partnership on the ground of fraud in the purchase, and consequently had a right to claim the proceeds of these goods in the receiver's hands, was not sufficient for the purpose indicated.

4. On the whole, there was no error in granting a nonsuit as to all the intervenors.

March 23, 1896. Argued at the last term.

Equitable petition. Before Judge Hardeman. Bibb superior court. April term, 1895.

Under a petition in the nature of a general creditors bill against Albert Gibian and L. J. Lillienthal, doing business under the firm name of A. Gibian & Company, a receiver was appointed, who took charge of the assets of said firm and proceeded to wind up its affairs under the direction of the court. Among the parties plaintiff by intervention were Fulton & Brother, the Chicago Distilling Company, and the Greenbrier Distillery, Charles Nelson proprietor. Said intervenors raised issues with certain mortgage creditors of Gibian & Company, wherein the validity of the mortgages and a certain transfer of accounts, notes and choses in action was questioned. The cause came on to be tried upon the issues so raised, and upon the conclusion of the evidence for the intervenors, the mortgagees moved for a nonsuit upon the issues touching them, which motion was granted, and intervenors assigned the following as errors:

1. The jury should have been allowed to pass upon the issue raised by Fulton & Brother, in which they claimed that $833.08 realized by the receiver from the sale of tobacco in the stock of Gibian & Company at the time the receiver took charge of it, belonged to them, because purchased from them fraudulently, so as to entitle them to rescind and to prevent the lien of the mortgages from attaching, they having been given to secure antecedent debts.

2. The mortgages given by Gibian & Co. to a number of their creditors, being dated the same day, made, delivered and filed for record at the same hour (9:15 p. m.), and covering all the assets of Gibian & Co., including choses in action and equities, constituted an attempt to make an assignment for the benefit of creditors, and were therefore invalid in that they did not conform to the law governing such assignments.

3. Said mortgages, taken in connection with the transfer and assignment of certain notes, accounts and choses in action to the parties to whom the mortgages were given, constituted an attempt to make an assignment for the benefit of creditors, but failed to comply with the statute governing such assignments.

4. The transfer of notes, accounts and choses in action by Gibian & Co. to said mortgagees was an attempt to make an assignment for the benefit of creditors, and was void for failure to comply with the statute governing such assignments.

5. The mortgages attempted to create a lien upon notes, accounts and choses in action; it being contended that these could not be mortgaged, and that the description given of them was insufficient.

6. During the trial plaintiffs introduced pages 146, 147, 148 and 149 of the stock-book of Gibian & Co., which purported to contain a complete statement of the liabilities of the firm on August 20, 1891. In argument of the motion for nonsuit, defendants' counsel claimed the right to com-

ment on other pages in said book beginning on page 150 and showing the assets of said firm. Plaintiffs contended that only the pages actually tendered, showing a complete statement and summary of liabilities, were in evidence, and if opposite counsel wished other pages of the book showing assets to go in, they must put them in. The court held that certain pages of the book could not be tendered in evidence without considering the whole book in, with the right to either side to use what they pleased of it; whereupon plaintiffs withdrew said pages from evidence. The ruling made by the court is assigned as erroneous.

Among other evidence introduced by plaintiffs was the testimony of J. H. Fulton who in 1891 sold Gibian & Company some manufactured tobacco, for Fulton & Brother. To his interrogatories were attached an itemized statement of goods shipped to Gibian & Co., showing bills of August 13th and September 5th, 1891, for $528.72 and $521.92, closed by acceptances which have not been paid; also, showing bills of May 28, June 6, and July 13, 1891, for $431.04, $95.28 and $523.92, closed by acceptances and paid; also, bill of October 3, 1891, for $526.80, being goods stopped in transit. Fulton testified: I dealt with Lillienthal, a member of the firm of Gibian & Co. On May 29, 1891, I called at their store to sell them tobacco. Lillienthal said there was one piece of goods he wanted made under his own brand, and asked me to call again that afternoon, which I did. Noticing that their stock was very much reduced, I asked him the reason, and he told me they were going out of the grocery business, that it kept from $60,000 to $100,000 of their money locked up, that the profits were too small on groceries and they were going into the tobacco, cigar and whiskey business exclusively, that there was more money in it, and that they would soon become the largest jobbers of these goods in the South. I then showed him my samples, priced my goods, and he selected the piece he wanted made up under his brand "Bon Ton." I offered to sell on terms of

sixty days acceptance, or two per cent. off for cash. He accepted the proposition, and began to write the contract. I called his attention to the fact that if he did not pay the cash, deducting the two per cent., he must close each bill by the firm's acceptance. He said, "I will insert it that way; but you will not need any acceptance, as we discount all of our bills and pay cash for all we buy." After the contract was signed and delivered, I left, fully believing from his statement that the firm was perfectly solvent. In extending credit and shipping the goods, I acted upon his statements to the effect that they intended doing a large business and paid cash for all they bought. I had no means of knowing anything regarding their financial standing and responsibility, outside of their statements and representations to me. If I had not thought them perfectly solvent, I would not have shipped the goods. Neither member of our firm ever sold any goods to Gibian previously, but our salesmen sold them some goods during 1885 and 1886.

The mortgages in question were fifteen in number, twelve of them being first mortgages, and three second mortgages. All of them were dated October 15, 1891, and filed for record on the same day at 9:15 o'clock p. m. One of the first mortgages was foreclosed and levied upon the stock of goods described therein, on October 16, 1891. The first mortgages purported to have been made to secure indebtedness by notes amounting to over $65,000; the second mortgages were to secure notes aggregating $5,689.53. At the time of their execution the total indebtedness of the firm was about $151,000. Of this the part secured by mortgages amounted to $114,000, and said mortgages were given to secure debts existing prior to their execution. The property conveyed by them is described by general summary of the stock of goods consisting of whiskies in barrels and bottles and other vessels, liquors of various kinds, wines, beers, ales, porter, flasks, tobacco and cigars, with numerous other articles enumerated, and all other articles, merchan-

dise or goods usually kept in a wholesale grocery and liquor store, all now in the two-story brick storehouse (describing it); also, office and store furniture in said store (enumerated); also, three bay mules described, with three drays and a buggy; "also all books of account, notes, choses in action, accounts and other evidence of indebtedness belonging to said parties of the first part, including amounts due said firm by A. Backer of New York, said accounts and claims amounting nominally to the sum of $76,411.81, and, with the exception of the account of A. Backer aforesaid, all fully shown and described on the books of said parties of the first part, and all now in said store." It is further stated that "this mortgage is intended to bear date and take rank with other first mortgages executed this day upon said property, and to be concurrent with the same without any priority whatever over said other mortgages."

The written transfer of choses in action, accounts and notes, to which was attached a long schedule referred to therein, is in the following words: "For value received we hereby transfer and assign for collateral security to [the mortgagees] the accounts, claims, choses in action and equities due and owing to us, a schedule of which is annexed to this transfer and made a part hereof; the said accounts to be collected or used and applied to the debts which the parties named hold against us; all amounts collected to be distributed *pro rata* upon the mortgages executed by us in favor of said parties on October 15, 1891. Any overplus that may be collected over and above the claims aforesaid shall be paid upon the mortgages of [the second mortgagees], to whom such claims are also transferred and assigned; such overplus to be distributed *pro rata* on the amounts due such parties, as shown upon certain second mortgages which were also executed by us on October 15, 1891, in their favor. We hereby waive all notice required by statute in case any of these claims should be made by the parties to whom they are hereby transferred." It

was admitted that the list of transferred accounts was the same as the list attached to the inventory made by the receiver; also, that the Bon Ton tobacco shown in the receiver's report and inventory was tobacco shipped by Fulton & Brother. Also, that the accounts and claims of the three contesting creditors were correct, that of Fulton & Brother amounting to $1,058.64. The receiver's inventory and report, filed November 5, 1891, showed 93 boxes of Bon Ton tobacco shipped by Fulton & Brother to Gibian & Co., of the invoice value of $1,023.25. This report showed the inventoried value of merchandise, fixtures, etc., to be $55,290.74, and the amount of open accounts to be $74,278.49. He reported that he found upon the books of Gibian & Co. a profit and loss account, generally considered as of little value, amounting to about $28,000.00, being the accumulation of worthless debts from January 1, 1886, to November 5, 1891. The receiver's final report also was in evidence, from which it appears that after the payment of expenses, receiver's and attorney's fees and other disbursements, the amount remaining is considerably less than the aggregate of the first mortgages. The receiver testified, that the report made November 5, 1891, showed all the assets that came into his hands, which, so far as he knew, were all the property of Gibian & Co. He did not know whether the accounts transferred by them were covered by the mortgages or not; did not think those accounts came into his hands. In the final report appear entries of accounts amounting to $30,518.03, notes amounting to $2,034, and merchandise and office furniture amounting to $350, turned over to A. Gibian by order of the court. The receiver presumed those accounts were accounts he had not been able to collect; they were not part of the transferred accounts that he knew of. He knew nothing about those transferred accounts, as that was done before he had anything to do with it. The transferred accounts never came into his possession at all. From the general character

of the description of the property in the mortgages, it might cover the property that came into his hands as receiver. Said description tallies with the property that came into his hands only in the respect, that some of the articles described in the mortgages were in the stock when he took charge. A stock of merchandise, office furniture, two or three mules, one or two drays, a horse and a top buggy came into his hands. He thought there was no other property of Gibian that came into his hands outside of the description contained in the mortgage. Nothing in his inventory appeared except what was in the storehouse, besides the mules, etc. He had not compared the list of accounts made by himself with the list of those transferred to the preferred creditors, to see whether or not they were the same; could not tell whether he had any of the transferred accounts or not. He followed the order of the court which directed him to take charge of the accounts set out in the intervention, and in so doing took charge of the accounts transferred to the mortgagees. It is a fact that the amount in his hands, after deducting taxes and other expenses of the receivership, is not sufficient to pay the preferred debts. He made all reasonable efforts to collect the accounts. Would say those not collected are uncollectible; those transferred to Gibian & Co. he considered practically uncollectible, else he would have collected them. They were placed in the hands of attorneys. He never had anything to do with the transferred accounts. In one instance part of an account was sent him that did not appear on his list, and he simply turned over the money. He thought it was $75.00 and that it went to the Exchange bank. He thought he collected something like $40,000 on the accounts. He settled several of those accounts by order of the court. He balanced several of them without a cent; for instance, one of Gibian's travellers collected about $3,000. From the tax digests of 1890, the aggregate returns of Gibian & Co. appeared to be $17,400; while Gibian's individual return amounted to $2,275, and Lillien-

thal returned one poll. For 1891 the returns of the firm aggregated $19,950; Gibian's individual return amounted to $8,200, and Lillienthal's one poll.

*Steed & Wimberly,* for plaintiffs.

· *Bacon & Miller, Hardeman, Davis & Turner* and *Hill, Harris & Birch,* for defendants.

LUMPKIN, Justice.

The facts of this case appear in the reporter's statement.

1. The execution and delivery by an insolvent partnership of several mortgages, all bearing the same date, does not make an attempted assignment for the benefit of creditors. *Hollingsworth* v. *Johns & Co.,* 92 *Ga.* 428. Nor does the transaction, considered as a whole, take the character of such an assignment because, in addition to the mortgages, the partnership also executed and delivered to the mortgagees and other creditors an instrument transferring as collateral security for the claims of all these creditors the choses in action belonging to the partnership, it not appearing that a trust in favor of the debtors or of any one else was thereby created. An insolvent debtor may assign to a creditor, for that creditor's exclusive benefit, choses in action as collateral security for his debt. *Boykin, Seddon & Co.* v. *Epstein et al.,* 94 *Ga.* 750. It being clearly the right of a debtor to secure his creditors in either of the above mentioned ways, we cannot see how securing them simultaneously in both ways would render the transaction an assignment to which the assignment acts of 1881 and 1885 would be applicable. The decision of this court in *Powell et al.* v. *Kelly Bros. et al.,* 82 *Ga.* 1, supports the ruling made in the present case.

· The case of *Kiser & Co.* v. *Dannenberg Co.,* 88 *Ga.* 541, is altogether dissimilar; indeed, the dissimilarity is so obvious, we need not undertake to specify the points of difference. In *Johnson* v. *Adams,* 92 *Ga.* 551, there was an element of trust. In the head-note of the decision therein,

the distinction between that case and one like the present is clearly pointed out. There are other somewhat similar cases in which a trust of the same character was created, which renders them inapplicable to the present discussion.

2. The instrument by which Gibian & Company, the insolvent partnership, sought to effect a transfer of their choses in action to certain of their creditors was as follows:

"For value received, we hereby transfer and assign, for collateral security, to the Exchange Bank of Macon [and other named creditors] the accounts, claims, choses in action and equities due and owing to us, a schedule of which is annexed to this transfer and made a part hereof. The said accounts to be collected or used and applied to the debts which the parties named hold against us, all accounts collected to be distributed *pro rata* upon the mortgages executed by us in favor of said parties on October 15th, 1891. Any overplus that may be collected over and above the claims aforesaid shall be paid upon the mortgages of Max Cohen [and two other named creditors], *to whom such claims are also transferred and assigned.* Such overplus to be distributed *pro rata* on the amounts due such parties, as shown upon certain mortgages which were also executed by us on October 15th, 1891, in their favor. We hereby waive all notice required by statute in case any of these claims should be made by the parties to whom they are hereby transferred. This October 16th, 1891."

It will be observed that the above instrument specifically stipulates that the transfer thereby made is to the second class, as well as to the first class, of the creditors therein named. Unquestionably, therefore, the legal title to the property thus assigned was effectually transferred to both classes of creditors jointly, each class having an equal right with the other to immediate possession, and each taking a present interest therein. It is true that the instrument effecting this transfer plainly contemplates that, in order to secure the fruits thereof, the property must necessarily be converted into cash; but it does not undertake to impose any duty in this regard upon the one class rather than upon

the other.   It simply vests in both classes jointly the legal title, leaving them free to adopt such means as they may command to effect a division of the property   Clearly, the creditors of neither class are constituted trustees for the other, given any power to exercise independent and exclusive control over the property, or charged with any duty of converting the same into cash and accounting to the members of the other class for their respective interests.   It would require a considerable strain to hold that any trust was created by this assignment.   Surely, if none of the creditors made any attempt to collect the choses in action so assigned for the protection of all, and allowed the same to become utterly worthless in their hands, we would not feel authorized to hold that either class would thereby become liable for the loss thus occasioned to the members of the other class.

The case of *Boykin, Seddon & Co.* v. *Epstein, supra,* distinctly settled the proposition that a debtor, in the exercise of his right to prefer creditors, could assign choses in action as collateral security, either to a single creditor, or to a number of creditors jointly, provided no trust was created by such transfer.   Of course, it is not a necessary prerequisite that each and every assignee should be given an equal interest in the property assigned; that is to say, the debtor would be entirely at liberty to provide that the interest of one creditor should be, say one half, that of another one twelfth, and so on.   In other words, it is not incumbent upon the debtor to himself divide the property up, giving to each creditor only so much thereof as it is desired shall constitute his part; but an assignment of the whole may by one instrument be made to all the creditors, the particular interest of each in the undivided whole being sufficiently specified to enable a subsequent division of the property to be made by the creditors among themselves.

The real objection urged against the assignment made in the present case is, that Gibian & Co. had no power to

arbitrarily divide the assignees into two separate and distinct classes, giving to one a preference and priority of payment over the other.    As no trust was imposed upon the first class by this arrangement, we fail to see how the assignment would be thereby invalidated.    The sole purpose of this provision was to definitely fix the beneficial interest each class should receive under the joint assignment to both. Had property worth a definite amount been assigned, there surely could be no objection to the debtors providing that the interest of certain creditors should, in any event, be equal to the full amount of the claims held by each, respectively; and after this interest was deducted and paid out of the property as a whole, the balance remaining should be divided *pro rata* among other named creditors according to the amounts of their respective claims.    What was done in the present instance, amounts practically and substantially to the same thing.    The exact value of the choses in action assigned could not, because of the uncertainty as to their collection, be definitely ascertained.    Therefore it was that Gibian & Co., wishing to save some of their creditors entirely from loss, provided that the interest of this class should equal the full amount of their claims, regardless of the actual value of the property assigned; and to successfully carry this scheme into effect, further stipulated that sufficient of the proceeds realized from the property should be first set apart and paid over to this class, in order that the remaining interest conferred upon the creditors of the second class might be determined and divided ratably among the latter.

Really, the important thing to be considered is whether or not the instrument by which the transfer was effected passed the title to the property actually assigned into both classes of creditors jointly, and not into one class alone for the benefit of both.    We have no hesitation in saying both classes took under the assignment a joint, present and immediate interest in the property.    This being so, it is of very

little practical importance to inquire as to the precise beneficial interest which, as between themselves, either class could assert against the other.

Had the property been actually assigned and transferred to one only of these classes, giving that class exclusive possession of and control over the property in order that its claims should first be satisfied, and imposing upon it the duty of then administering the property for the benefit of the other class, an express trust would have been created, and the case would have worn an entirely different aspect.

3, 4. We do not think that Fulton & Bro., intervening creditors, established by a sufficiency of proof their contention that they were entitled to rescind the sale of their goods to Gibian & Co., on the ground of fraud in the purchase. And on the whole, we find no error in the granting of a general nonsuit as to all the intervenors.

*Judgment affirmed.*